## SUBURBAN PARK APARTMENTS CORPORATION v. BOWLES, Price Adm'r.

### No. 85.

United States Emergency Court of Appeals.
Heard at·Washington Dec. 15, 1943.

Decided Dec. 31, 1943.

Leo M. Alpert, of Baltimore, Md. (Makover & Kartman, of Baltimore, Md., on the brief), for complainant.

Sol M. Linowitz, Chief, Court Review Rent Branch, of Washington, D. C. (Henry M. Hart, Jr., Acting Gen. Counsel, Nathaniel L. Nathanson, Associate Gen. Counsel, and Harry H. Schneider and Charles P. Liff, Attys., all of Office of Price Administration, all of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and MAGRUDER and LAWS, Judges.

MARIS, Chief Judge.

Complainant is the owner of an apartment building in Norfolk, Virginia, containing 209 apartment units. The building was constructed pursuant to the provisions of the National Housing Act, mortgage insurance being issued by the Federal Housing Administration. Under Maximum Rent Regulation No. 19 for Housing Accommodations other than Hotels and Rooming Houses in a Portion of the Hampton Roads Defense-Rental Area, issued May 27, 1942, April 1, 1941, was established as the maximum rent date for rents charged in the area in which complainant's building is located. The rentals for bare shelter originally proposed by the Federal Housing Administration and complainant were increased at the beginning of operations to include an amount to cover the cost of furnishing gas for cooking and heating water.

Subsequently complainant arranged to supply fuel oil for heating purposes to all the apartment units and for this reason as well as because of other increases in services rendered to the tenants complainant filed with the Area Rent Director in 1942 a petition for adjustment of its rents. This petition for adjustment was granted in part in November, 1942, by allowing specific rent increases for each of the apartments. The complainant filed a protest against the refusal by the Area Rent Director to grant the full increases requested. This protest was denied ·on February 4, 1943, but its denial has not been complained of in this court. However, on March 12, 1943, complainant filed a protest against the Maximum Rent Regulation itself. This protest was denied by the Price Administrator on August 21, 1943, and the filing of the present complaint followed on September 20, 1943.

Complainant does not attack the regulation as generally unfair or inequitable when issued. On the contrary it bases its protest, as it must, on grounds alleged to

have arisen more than sixty days after the issuance of the regulation. The complaint states that after December 31, 1942, when the first full year of operations closed, complainant's income statement for the first time disclosed "unique, particular, unusual and unforeseen expenses" and that the maximum rent regulation then became unfair and inequitable in its application to the complainant in that it did not provide for an upward adjustment of maximum rents in such a situation. The complainant does not take issue with the underlying basis of the maximum rent date method of rent control, which is that rents are to be frozen at levels arrived at between landlords and tenants after free bargaining in a competitive market. It contends rather that its rental schedule was not the result of such bargaining and that, except for rent control, increases in its rents would have resulted in the ordinary course of events under normal times. In this connection it points out that the Federal Housing Administration has stated that, were it not for the existence of the Maximum Rent Regulation, it would approve an upward adjustment of complainant's rents at this time.

■■ Insofar as complainant relies upon the proposition that since its rents were determined in advance in agreement with the Federal Housing Administration they were not the result of bargaining in a free market and the regulation should, therefore, have authorized their adjustment on

tablishes his rents upon a satisfactory basis in the light of prevailing market conditions and later experiences cost increases peculiar to himself. In Lakemore Co. v. Brown, Em.App., 1943, 137 F.2d 355, we held that a similar rent regulation was not invalid because it did not provide for the adjustment of maximum rents in the case of an individual landlord who had experienced items of increased cost peculiar to itself. That ruling is equally applicable here. It follows that the Administrator did not err in denying complainant's protest against the regulation.

■ Moreover, we think it appropriate to point out that even if the regulation authorized an adjustment of maximum rents upon the grounds alleged, the record before us does not disclose a case for relief. Although it is true that the complainant's expenses have substantially increased above those which were estimated by the Federal Housing Administration in its income analysis and appraisal of complainant's project, the fact is that complainant's income, as a result of rent increases already allowed by the Price Administrator as well as the full occupancy of its apartments, has increased to an equal if not greater extent, so that its operations still show a substantial net profit. A comparison between the estimated figures contained in the project income analysis and appraisal and the actual figures from complainant's books for the year 1942 and for the first five months of 1943 shows the following:

|  | Estimate | Year 1942 | 5 Months 1943 |
|---|---|---|---|
| Income | $99,468.00 | $127,942.71 | $54,540.23 |
| Less expenses, taxes and mortgage interest | 63,887.00 | 89,035.57 | 39,904.43 |
| Net income before depreciation and replacement charge | 35,581.00 | 38,907.14 | 14,635.80 |
| Less depreciation and replacement | 19,031.00 | 32,690.69 | 13,640.81 |
| Net profit | 16,550.00 | 6,216.45 | 994.99 |

a comparable basis, the case is indistinguishable in principle from that of Northwood Apartments v. Brown, Em.App.1943, 137 F.2d 809. For the reasons stated in our opinion in that case this proposition cannot be sustained. To the extent that complainant's contention is based upon the proposition that the regulation should afford it an opportunity to secure an increase in its rents to compensate it for "unique, particular, unusual and unforeseen expenses" its situation is no different from that of any other landlord who es-

An examination of these figures discloses that the reduction of complainant's book profit below the amount estimated results almost wholly from the fact that complainant has chosen to charge depreciation on its buildings at the rate of 3% instead of 2% as estimated in the project income analysis and appraisal. It is true that its buildings cost it $59,488.00 more than was estimated. But even if we add 2% of this additional cost to the previously estimated depreciation the total annual charge for depreciation at 2% plus the reserve for re-

placements as originally estimated comes to only $20,220.[1] If this figure had been used by complainant in 1942 and 1943 the results would have been as follows:

|  | Estimate | Year 1942 | 5. Months 1943 |
|---|---|---|---|
| Net income before depreciation and replacement charge | $35,581.00 | $38,907.14 | $14,635.80 |
| Less depreciation and replacement | 19,031.00 | 20,220.00 | 8,425.00 |
| Net profit | 16,550.00 | 18,687.14 | 6,210.80 |

The Federal Housing Administration's income analysis and appraisal of complainant's project predicts for it an economic life of 50 years for which a 2% depreciation rate is appropriate. The reserve for replacements which was included in the analysis in addition to the 2% depreciation was intended to provide a fund sufficient to meet the estimated costs of replacement of equipment or structural items, such as refrigerators, plumbing fixtures, electric fixtures, laundry equipment, elevators, roofs, boilers, etc. See Federal Housing Administration, Rental Housing Manual, 1940, §§ 2628, 2681a(1). It will thus be seen that the figure of $20,220 previously mentioned should be a sufficient annual charge against income on this account. If complainant desires to be more conservative and to estimate the economic life of its buildings at 33⅓ years there may be nothing to prevent it from doing so, but it can hardly be heard on this basis to argue that its project is in financial jeopardy.

The complaint is dismissed.

---

[1] Depreciation at 2% on estimated cost of $765,832.... $15,317
Depreciation at 2% on additional cost of $59,488...... 1,189
Reserve for replacements, as estimated ................ 3,714

